**CAB OPERATING CORP. et al., Plaintiffs,**

v.

**The CITY OF NEW YORK, Robert F. Wagner, as Mayor of the City of New York, James J. McFadden, Acting Commissioner, Department of Labor of the City of New York, Defendants.**

United States District Court
S. D. New York.
June 28, 1965.

Nordlinger, Riegelman, Benetar & Charney, Henry G. Friedlander, New York City, for plaintiffs, David L. Benetar, Robert C. Isaacs, Sanford Browde, New York City, of counsel.

Leo A. Larkin, Corp. Counsel, City of New York, for defendants, Robert E. Hugh, Asst. Corp. Counsel, and John F. Kelly, Asst. Corp. Counsel, of counsel.

Morris J. Kaplan, New York City, for Local 826, International Brotherhood of Teamsters amicus curiae.

Donald F. Menagh, New York City, for Taxi Drivers Organizing Committee, AFL–CIO, amicus curiae.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, George B. Driesen, Attys., N. L. R. B., amicus curiae.

FREDERICK van PELT BRYAN, District Judge.

The thirty-six plaintiffs here are fleet owners operating taxicabs in the City of New York. They have sued to enjoin the Mayor and the Acting Commissioner of Labor of the City of New York from holding an election among the employees in the New York City taxicab industry to resolve questions concerning union representation.

Plaintiffs contend that the election constitutes unwarranted and unlawful intervention by the defendant officers of the City in an area preempted by the National Labor Relations Act, 29 U.S.C. § 151 et seq. and over which the National Labor Relations Board has exclusive jurisdiction and control.

Federal district court jurisdiction is not disputed and is clearly conferred by 28 U.S.C. § 1337 since the action arises under an Act of Congress regulating commerce. See Oil, Chemical and Atomic Workers, etc. v. Arkansas Louisiana Gas Co., 332 F.2d 64 (10 Cir. 1964); General Electric Co. v. Callahan, 294 F.2d 60, 63 ftn. 2 (1 Cir. 1961), cert. dismissed 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962).

Plaintiffs' present motion for a preliminary injunction was heard before me on June 15, 1965 upon an order to show cause issued by Judge Palmieri. On June 10, 1965, after hearing at length from the parties to the action, the National Labor Relations Board and two interested unions, Judge Palmieri refused the request of the plaintiffs temporarily to restrain the holding of the election then scheduled for June 14 and June 15. However, he issued an order to show cause which restrained the

Mayor and the Labor Commissioner from counting the votes or publishing the results of the election, and directed that the ballots should be sealed and kept in safe custody until the hearing of the motion.

The election was held as scheduled on June 14 and June 15 and the ballots were sealed as directed by Judge Palmieri. At the hearing of the motion I directed that the ballots be kept sealed, as the temporary restraining order provided, pending the determination of the motion. The preliminary injunctive relief now requested by the plaintiffs is thus directed solely against the counting of votes and publishing of the results of the election. The defendants have cross-moved to dismiss the complaint pursuant to Rule 12 (b) (6), F.R.C.P., for failure to state a claim upon which relief can be granted.

This case poses the recurring and troublesome problem of what constitutes state or local intervention in a labor controversy affecting commerce which is precluded by the exclusionary sweep and effect of the National Labor Relations Act.

The basic facts, as developed on the motion before me, are as follows:

For some months there has been ferment in the New York City taxicab industry on the question of union organization and representation. Subjects in dispute between the fleet owners and organizing unions included (1) what union should be recognized as bargaining agent; (2) how should that question be determined; (3) whether organization and representation should be on an industry-wide, on a fleet or on a garage basis; and (4) whether relatively casual as well as regular employees should be permitted to participate in any election, and where the lines between them should be drawn.

The Taxi Drivers Organizing Committee AFL–CIO (TDOC) has been recently engaged in organizing the employees in the industry. Local 826, International Brotherhood of Teamsters (Teamsters) has also been attempting such organization for a number of years.

Between March 8, 1965, and April 1, 1965, the fleet owners, who are the plaintiffs in this action,[1] filed petitions with the N.L.R.B. pursuant to § 9(c) (1) (B) of the Act, seeking a determination as to the labor organization which should be recognized as the representative of their employees. The Board found that there was reasonable cause to believe that a question of representation affecting commerce existed and directed a hearing to determine which employees would be eligible to vote and to determine the appropriate unit.

Pending as well were charges of refusal to bargain under § 8(a) (5) of the Act filed by the TDOC against the plaintiffs which were dismissed by the Regional Director subsequent to the hearing of this motion. Other charges under §§ 9, 8(a) (1) and 8(a) (3) of the Act are still pending.

Also pending before the Board were two petitions by the Teamsters originally filed in August 1964 and re-filed in January 1965, asking certification as the representative of drivers employed by two garages. These petitions were consolidated with the proceedings brought by the fleet owners.

Hearings in the consolidated proceedings have been closed and briefs were due by June 14, 1965, the date set by the City for its election. The issues in these proceedings are now sub judice before the Board. Upon determination by the Board of these issues presumably elections will be directed under the Board's auspices and within the framework the Board prescribes.

On March 24, 1965 a strike of taxicab employees virtually shut down taxicab operations in the city. It was accompanied by some disorder and violence. In the afternoon of that day TDOC called a mass meeting in Madison Square Garden in connection with the strike. The Mayor spoke at that meeting and pro-

---

1. There are said to be some 81 fleet owners in the City. The 36 plaintiffs include the larger fleets.

posed the appointment of a panel to investigate and report on the controversy between the fleet owners and their employees. The drivers then returned to work.

On March 26, 1965 the Mayor appointed the three-man panel which he had proposed. The panel held hearings and rendered a report on April 30. It reported that it had not been able to find a basis for an agreement between the parties on procedures for the resolution of the question of representation. It recommended that the parties agree to an election on a city-wide basis "conducted by the National Labor Relations Board or other qualified agency," and that drivers who worked only one or two days a week should be excluded from voting.

One member, while agreeing that there should be an election, was of the view that it should be exclusively in the hands of the Board in view of TDOC activity among the employees to that end. He also was of the view that the election should not be city-wide but should be by separate garages.

Subsequently there was further unrest in the industry when a wild-cat strike took place in Queens on May 18.

The Mayor then sent telegrams to the TDOC and the taxicab fleet owners endorsing the report of his panel and stating

"I am prepared to suggest to the National Labor Relations Board that it conduct the election providing both sides agree to the terms proposed by the panel. If they do not agree the City itself will conduct the election since it is essential for the city to determine the wishes of the taxi drivers themselves."

This was followed by a telegram from the Labor Commissioner requesting that the fleet owners attend a meeting at his office to work out arrangements "for an election as directed by Mayor Robert F. Wagner among the employees of the taxicab industry to resolve the question concerning Union representation." The fleet owners refused to attend and protested the holding of the election upon the ground, among others, that the question of representation was already pending before the NLRB which had exclusive jurisdiction of the subject matter.

On June 6, 1965 the Labor Commissioner announced that his Department would conduct a city-wide election on June 14, 1965 for all taxi drivers and mechanics in garages who worked at least three days a week on a city-wide basis.

On June 7 Local 826 of the Teamsters was invited to have its name placed on the ballot to be used. The Teamsters refused on the ground that proceedings for certification and for an election were already pending before the NLRB and that the proposed election interfered with its rights and with NLRB jurisdiction.

Machinery for the election was set up and a notice of election containing a sample form of ballot was circulated, so it is said, among some 45,000 industry employees. The notice described the purpose of the election to be "to determine whether or not [the taxi drivers and garage maintenance men] wished to be represented by the Taxi Drivers Organizing Committee, AFL–CIO for the purpose of collective bargaining in the industry." It defined and limited the eligibility of those who would be permitted to vote.

The ballot was substantially in the format of the ballot customarily used by the NLRB in conducting representation elections. It posed the question "Do you wish to be represented for purposes of collective bargaining by: Taxi Drivers Organizing Committee, AFL–CIO," with squares for "Yes" and "No" to be marked with an "X". The ballot contained no reference to the Teamsters.

Final preparations for the election then proceeded under protests from both the fleet owners and the Teamsters. Before the election could be held, however, the present action was commenced and the temporary restraining order issued

by Judge Palmieri followed which sealed the ballots.

At the hearing before me on the motion for a preliminary injunction the plaintiff fleet owners contended (1) that the election directed by the defendant City Officers was direct intervention in an area preempted by the National Labor Relations Act and reserved exclusively by that Act to the NLRB; (2) that the publication of the results might well render nugatory the proceedings sub judice before the Board and stultify any orders that the Board might make as a result, but in any event would cause such grave confusion and difficulty as to impair the rights of both employers and employees to an appropriate election under the Board's auspices; and (3) that unless publication was restrained irreparable injury would be caused both to them and to the employees. The Teamsters Local, as amicus curiae, supported this position and urged that its rights under the Act would be irreparably injured also.

The City, on the other hand, although submitting no briefs, urged that the election did not interfere in any way with the proceedings before the Board or any orders which it might issue; that it was merely a non-binding opinion poll for the purpose of allaying industrial strife affecting the welfare of the City; and that the election was a proper exercise of the powers of the Labor Commissioner under § 902, subd. a of the New York City Charter to take expedient steps to effect a settlement of labor disputes which threatened the public welfare. The TDOC, as amicus, claiming the support of a majority of the taxicab employees, endorsed the City's position.

The NLRB, as amicus, took an ambivalent position. It was of the view that the election directed by the City officers was in an area preempted by the National Labor Relations Act even if it was not binding and was enforceable only by public opinion. Nevertheless, the Board took "no position on whether publication of the results of that election should be enjoined at the instance of the plaintiffs."

### (1)

There is no dispute that the New York City taxicab industry is an industry affecting commerce within the meaning of the National Labor Relations Act and that the NLRB has jurisdiction over labor disputes arising in that industry.

The Board has consistently exercised such jurisdiction. See JAT Transportation Corp., 128 N.L.R.B. 780 (1960) and cases there cited. Indeed, it has specifically taken jurisdiction of the underlying controversy in the industry which is involved here.

### (2)

By the enactment of the National Labor Relations Act (29 U.S.C. § 151 et seq.) and the amending Labor Management Relations Act (29 U.S.C. §§ 141–144, 171 et seq.) Congress sought to establish and enforce a uniform national labor policy.[2] Its purpose was to minimize industrial strife by providing uniform protections and procedures looking toward the fair resolution or adjustment of labor controversies. It entrusted the administration and enforcement of that policy to the National Labor Relations Board "a centralized administrative agency, armed with its own procedures, and equipped with its special knowledge and cumulative experience." San Diego Bldg. Trades Council, etc. v. Garmon, 359 U.S. 236, 242, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959). This was necessary "to obtain uniform application of * * substantive rules and to avoid * * * diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies * * *." Garner v. Teamsters, etc. Union, 346 U.S. 485, 490, 74 S.Ct. 161, 166, 98 L.Ed. 228 (1953).

In order to prevent such conflicts and the consequent frustration of national labor policy and administration, the states (and a fortiori municipalities)

---

2. See 29 U.S.C. §§ 141, 151.

are precluded from acting in labor controversies falling within the purview of the Act when the exercise of state power over a particular area of activity threatens interference with the administration of the Act by the Board. The areas of actual or potential conflict are thus federally preempted and the subject matter so preempted is left to the exclusive competence of the Board.

The initial question in the case at bar is whether the activities of the City of New York with respect to this labor controversy, and particularly the election which its officers conducted, involve actual or potential conflict with the Act or its administration. If they do they fall in the preempted area and the officers of the City are engaging in activities from which they are excluded.

While states and municipalities are not totally excluded from activities affecting interstate labor relations, see, e. g., San Diego Bldg. Trades Council, etc. v. Garmon, supra, 359 U.S. at pp. 242–244, 79 S.Ct. 773; International Union, United Automobile, etc. Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); United Auto, etc. Workers v. Wisconsin Employment Relations Board, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956); United Construction Workers, etc. v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), preemption is invoked whenever there are "the very real potentials of conflict" between federal and state regulation. La Crosse Telephone Corp. v. Wisconsin Employment Relations Board, 336 U.S. 18, 26, 69 S.Ct. 379, 383, 93 L.Ed. 463 (1949). Such "real potentials of conflict" exist when it is clear or may fairly be assumed that the activities which the state purports to regulate are prohibited or protected by the Act or interfere with or impinge upon rights granted thereby. When an activity is "arguably subject" to the Act the states must defer to the Board's exclusive jurisdiction. San Diego Bldg. Trades Council, etc. v. Garmon, supra.

Plainly, state or city action which purports to bind the parties to a dispute within the jurisdiction of the Board is prohibited. See, e. g., La Crosse Telephone Corp. v. Wisconsin Employment Relations Board, supra; International Union, United Automobile Workers, etc. v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949); Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947). The prohibition also applies to activities of officers or bodies purporting to act under the sanction of state or local law to coerce parties to a controversy or to force its resolution through the pressure of molded public opinion in derogation of federally granted rights. See General Electric Co. v. Callahan, 294 F.2d 60, 67 (1 Cir. 1961), cert. dismissed, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962); Oil, Chemical and Atomic Workers, etc. v. Arkansas Louisiana Gas Co., 332 F.2d 64 (10 Cir. 1964); Grand Rapid City Coach Lines v. Howlett, 137 F.Supp. 667 (W.D.Mich., 1955). Moreover, preemption applies not alone where there are actual proceedings pending before the Board which may give rise to conflict but in any situation over which the Board has or may assert jurisdiction. See San Diego Bldg. Trades Council, etc. v. Garmon, supra; Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957).

In the case at bar proceedings are pending sub judice before the Board. These proceedings involve important rights of both employer and union parties to the controversy with which we are concerned here and those of individual employees as well. The employers seek an election under the auspices of the Board and a preliminary determination of such basic questions as the qualifications to vote in the election, the appropriate unit and the unions to be voted for. In these proceedings one of the unions concerned, the Teamsters, seeks immediate certification as a bargaining representative for employees of two of the garages.

The parties to such proceedings, which include the plaintiffs in this action are seeking to enforce before the Board rights granted them by § 9 of the Act. Necessarily involved likewise are rights of the TDOC and the Teamsters and of the employees themselves to organize under §§ 7 and 9 and the protections given them by the unfair labor practice provisions of § 8.

The election conducted by the Labor Commissioner under direction of the Mayor was held at the very time the Board had under consideration these serious issues under the Act. It was held over the protests of both the employers and the Teamsters, vitally interested parties, who asserted their rights to determination by the Board of the questions of representation and other questions pending before it.

The ballot which was circulated to the employees presented a single choice—whether they were for or against representation by the TDOC, the only union whose name appeared on the ballot. The number of those entitled to vote was strictly limited. The vote was predicated on a city-wide bargaining basis. Thus, the election was designed to pose directly the question of representation pending before the Board and necessarily purported to resolve in advance two other pending questions—eligibility to vote and appropriate bargaining unit.

While defendants seek to make it appear that this was not an "election" but merely a public opinion poll, the whole tenor of the events and statements leading up to and surrounding the vote is to the contrary. The public statements issued by City officers and TDOC representatives,[3] the literature distributed by the TDOC[4] to its members, and the very form of the ballot indicates that this was an election intended insofar as possible to pre-determine the very issues before the Board. Indeed, the ballot itself, in almost the exact format of the ballots used in Board elections, was plainly designed to lend an official aura to the vote. As Judge Palmieri indicated at the hearing on the temporary restraining order, "There is an element, unfortunately, of deception in that procedure."

Under all the circumstances here it can reasonably be assumed that the purpose of the ballot at the very least was to mold public opinion so as to bring pressure to bear on the parties who protested the election, to force the resolution of the current controversy by recognition of the TDOC as the city-wide bargaining representative of the employees and thus to resolve the very matters now pending before the Board. Indeed, as the Mayor himself said, "I assume it [the election] will weigh heavily in the force of public opinion."

It is by no means improbable that announcement of the results of the election and the subsequent use to which those results are put might invalidate any election ordered by the NLRB. In fairness to the parties to an election, the Board frequently has set aside an election because of conduct affecting its result even though such conduct is not an unfair labor practice. See, e. g., N.L.R.B. v. Shirlington Supermarket, Inc., 224 F.2d 649, 652–653 (4 Cir. 1955), cert. den., 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801; Utica-Herband Tool Div., 145 N.L.R.B. 1717, 1719 (1964); General Shoe Corp., 77 N.L.R.B. 124, 126 (1948).

But it is unnecessary to reach that question here. The results of the election, if announced, can scarcely fail to influence strongly the result of any election which the Board may determine should be held. Apart from predetermination of the question of representation, great confusion and difficulty on such issues as the qualifications to vote and the appropriate bargaining unit is likely. There is danger that, for all prac-

---

3. For example, in an interview on WCBS-TV, June 6, 1965, Acting Labor Commissioner McFadden stated: "Now, the Mayor felt, and we agree, that the thing to do is to resolve the representation question, and that is what this election's going to do; it's going to resolve this."

4. See, e.g., T.D.O.C. Flyer, Ex. 4a, emphasizing the legality of the election.

tical purposes it would become impossible to make effective any determinations which the Board might make to the contrary, and that any election the Board might order would be virtually meaningless. See Brown & Root Caribe, Inc., 123 N.L.R.B. 1817, 1819 (1959) (non-Board election held prior to Board election rendered Board election a "futility").

■ A mere informal poll of employees by a private party without any elements of coercion may not per se constitute an unfair labor practice. See N.L.R.B. v. Lorben Corp., 345 F.2d 346, (2 Cir., 1965). But cf. Brown & Root Caribe, Inc., supra. But a formal election sponsored and conducted by public officials under governmental aegis and expected to exert the coercive pressure of public opinion upon non-consenting parties to a controversy is quite different. The National Labor Relations Act contemplates elections untrammeled by coercive influences of private or state action. Cf. La Crosse Telephone Corp. v. Wisconsin Employment Relations Board, supra; Oil, Chemical and Atomic Workers, etc. v. Arkansas Louisiana Gas Co., supra.

The Act contemplates determinations by the Board of issues of representation, eligibility to vote, and appropriate bargaining unit which can be practically and effectively carried out. The City election was apparently designed to marshal and exert the pressure of public opinion to achieve results which may be contrary to Board determinations and which may prevent them from being carried out. It seems unnecessary to emphasize the abuses to which an election device of this nature may be subject in a strongly anti-labor or anti-management community.

■ Moreover, the City election may gravely trench on the rights of both employees and employers. Employees have the right to have an election conducted by the Board to determine their bargaining representative protected by all the safeguards which the Board in the exercise of its special knowledge and cumulative experience can provide. See

Brown & Root Caribe, Inc., supra; Offner Electronics, Inc., 127 N.L.R.B. 991, 992 (1960). Employees in two garages who apparently have already organized may have the right to be represented by that union and to have it certified for those units. Employers in turn have the right to determination by the Board of the appropriate bargaining unit and of the bargaining representative with whom they must deal.

It needs no prophetic insight to visualize the confusion and difficulty which is likely if the results of the City election are published. This "may fairly be assumed" (San Diego Building Trades Council, etc. v. Garmon, supra, 359 U.S. at 244, 79 S.Ct. 773) from the facts concerning the election itself and the surrounding circumstances. Whether the vote is in favor of the TDOC, as apparently expected by the parties, or whether it is to the contrary, as is not beyond the bounds of possibility, the confusion and difficulty created would inevitably conflict with the proceedings before the Board and its subsequent orders and impinge on the rights of interested parties. This is sharply pointed up by indications that many employees believe that the election would finally resolve the current controversy concerning representation— a belief quite understandable in view of the circumstances under which the election was conducted. Indeed, the prevailing emotional climate, culminating in the strike commenced as this opinion was about to be filed, does not lend itself to an appreciation of legal niceties as to whether the election is binding or not.

All this appears from the material now before me and is largely undisputed. However, there has not been a trial on the merits. Additional facts and circumstances may be adduced at the trial of the action which would throw a different light on the election and its consequences and perhaps lead to different conclusions. The conclusions I reach here are based on the record as it now stands.

I do not question the bona fide desire of the Mayor of the City of New York and the Commissioner of Labor to bring

about industrial peace in the disturbed taxicab industry. Nor do I question their good faith in attempting to achieve that result by the methods which were adopted here. I am reluctant to override local authorities on measures which they deem should be taken in performance of their official duties.

■ But this is beside the point. In the present state of the record I must conclude that the activities of the Mayor and the Labor Commissioner in connection with this election clearly fall within the area preempted to the National Board. The conflict between their activities, however well meant, and federal labor policy and administration is obvious and inescapable.

### (3)

In this posture of the case the only remaining question is whether plaintiffs are entitled to the preliminary injunctive relief which they seek.

It is plain that the complaint states a claim upon which relief can be granted. It is reasonably probable that the plaintiffs will succeed on the merits of the action.

Plaintiffs have sufficiently sustained their burden of showing irreparable harm to them in the event that preliminary relief is not granted. What has already been said about probable interference with the proceedings before the Board and the determinations which it is charged by Congress with making and with the plaintiffs' rights under the National Act, in itself demonstrates that probability. Moreover, there is probability of disruption of plaintiffs' businesses and impaired relations with their employees for which they have no adequate remedy.

The Board's initial brief expressed the tentative view based on the information then before it, that standing by itself, the effect of the City election on any election which the Board ordered might be speculative. But, as emerged from the papers before me and from the oral argument, the City election was not held in a vacuum nor would the publication of the results be in a vacuum. All of the facts and surrounding circumstances before me must be taken into account if the probable consequences of publication are to be objectively evaluated. Such an objective evaluation shows clearly the probability of irreparable harm to these plaintiffs if publication of the results is permitted. Cf. Oil, Chemical and Atomic Workers, etc. v. Arkansas Louisiana Gas Co., supra, 332 F.2d at 64; Grand Rapids City Coach Lines v. Howlett, 137 F.Supp. 667, 673 (W.D.Mich., 1955).

■ A showing of probability of irreparable harm is quite sufficient. See, e. g., Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834; Societe Comptoir De L'Industrie Cotonniere Establissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 35 (2 Cir.1962); Sawyer v. United States Steel Co., 90 U.S.App.D.C. 416, 197 F.2d 582, 584 (1952), aff'd, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153.

Moreover, the public interest is heavily involved and courts of equity go farther to give relief in the furtherance of the public interest than when private interests only are involved. See Virginia Ry. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Yakus v. United States, supra, 321 U.S. at 441, 64 S.Ct. at 675, and cases there cited. There may be substantial danger to the public interest if the results of this election are published in view of the probable frustration of the objectives of the National Act and the procedures it provides to further labor peace in an industry plainly affecting the welfare of the population of the City.

Finally, when the equities here are balanced, as they should be, it appears that while the withholding of preliminary relief may cause irreparable harm to the plaintiffs, any injury to the defendants or to any other parties in interest arising from the granting of the injunction would be slight. See Yakus v. United States, supra, 321 U.S. at 440, 64 S.Ct. at 674.

The questions at issue in the current controversy are already under consideration by the Board. It can be assumed

that the Board will act with maximum expedition in this explosive situation to resolve such questions and that the further procedures provided by the Act can be promptly effected.

 It may be noted that Justice Postel of the New York Supreme Court already has issued a temporary injunction against counting or publishing the results of the City election. This injunctive order was issued in a taxpayer's suit brought on the theory that the City's officers had no power under § 902, subd. a of the City Charter to hold the election. Marks v. City of New York, et al., Supreme Court, New York County, (June 23, 1965). In the course of discussing the question of irreparable damage if preliminary relief were not granted, Justice Postel said in his opinion:

"If, indeed, the election will have no binding effect, although most certainly the employees in the industry believe otherwise, it would seem that the election perpetrates a hoax on the employees and will cause confusion, labor strife and disruptive relations between employees and employers, with resulting injury to the public."

The issuance of that preliminary injunction does not render the question before me moot. The substantive issues in the Marks case are quite different from those here. It is impossible to forecast how long the preliminary relief granted by Justice Postel will continue. This court cannot shirk its federal responsibilities by relying on his order.

 I find that the plaintiffs have shown that there is reasonable probability (1) that they will succeed on the merits of this action; (2) that they will suffer irreparable harm if preliminary relief is not granted; (3) that if relief were withheld there may be irreparable harm to the employees in the industry and others as well, and the public interest is likely to be adversely affected; and (4) that plaintiffs have no adequate remedy at law.

Defendants' motion pursuant to Rule 12(b) (6), F.R.C.P. to dismiss the complaint for failure to state a claim upon which relief can be granted is denied. Plaintiffs' motion for a preliminary injunction is granted.

A preliminary injunction will issue restraining the defendants, pending the final hearing and determination of this action, or until further order of the court, from canvassing or counting the votes cast in the election; from reporting, announcing or publishing in any manner whatsoever the results of the election; and from using the results for any purpose. The ballots cast will continue to be held secret and inviolate.

There will be, however, one exception to these directions. As far as the order of this court is concerned if the National Labor Relations Board desires the ballots for such lawful purposes as are consistent with its duties and responsibilities and with the rights of the interested parties, the defendants may deliver such ballots to the Board and the Board may make such use of them as in its discretion it may deem appropriate.

As a condition of the grant of injunctive relief plaintiffs will be required to post security in the sum of $50,000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.C.P.

Settle order on notice in accordance with this opinion.