HOTEL AND RESTAURANT EMPLOY-
EES AND BARTENDERS INTERNA-
TIONAL UNION LOCAL 54 and Frank
Gerace, Plaintiffs,

v.

Martin DANZINGER, Acting Chairman, Donald Thomas, Commissioner, Madeline McWhinney, Commissioner, Carl Zeitz, Commissioner, Casino Control Commission and G. Michael Brown, Director, Department of Law and Public Safety, Division of Gaming Enforcement and Department of Law and Public Safety, Division of Gaming Enforcement and Thomas H. Kean, Governor, Defendants.

Civ. A. No. 81–2630.

United States District Court,
D. New Jersey.

March 22, 1982.

On Motion for Temporary Injunction
Pending Appeal April 12, 1982.

320

Robert J. Genatt, Lawrenceville, N. J., Gen. Counsel, New Jersey Casino Control Comn., by Thomas N. Auriemma, Deputy Director, Legal Div., Trenton, N. J., for defendants Danzinger, Thomas, McWhinney, Zeitz and Casino Control Comn.

Irwin I. Kimmelman, Atty. Gen. by Michael R. Cole, G. Michael Brown, Asst. Attys. Gen., Anthony J. Parrillo, James M. Flanagan, Deputy Attys. Gen., Div. of Gaming Enforcement, Trenton, N. J., for defendants Brown, Div. of Gaming Enforcement and Kean.

Robert I. Segal, Haddonfield, N. J., and John J. Reynolds, Chicago, Ill., for amicus curiae Hotel and Restaurant Employees and Bartenders Union, AFL–CIO.

Howard J. Casper, Cherry Hill, N. J., for amicus curiae International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 331.

Thomas P. Foy, Hartman, Schlesinger, Schlosser & Faxon, Mount Holly, N. J., for amicus curiae New Jersey State AFL–CIO.

BROTMAN, District Judge.

New Jersey's Casino Control Act, L.1977, c. 110, § 1 *et seq.*, as amended by L.1978, c. 7, § 1 *et seq.*, N.J.Stat.Ann. § 5:12–1 *et seq.* (West Supp.1981) (hereinafter the "Act"), establishes the conditions under which the nascent casino gambling industry in Atlantic City, New Jersey, is to be regulated. Section 93 of the Act, N.J.Stat.Ann. § 5:12–93 (West Supp.1981), prohibits labor organizations representing employees of casinos and casino hotels from collecting dues from those employees, or from administering pension and welfare funds, unless the union has registered with the Casino Control Commission and the union's officers, agents and key employees have met certain qualifications delineated in § 86 of the Act. N.J.Stat.Ann. § 5:12–86 (West Supp.1981). (Portions of the Casino Control Act are set forth in the Appendix to this opinion.)

Hotel and Restaurant Employees and Bartenders International Union Local 54 (hereinafter "Local 54"), and its president,

Bernard N. Katz, N. Michael Katz, Meranze, Katz, Spear & Wilderman, Atlantic City, N. J., for plaintiffs.

Frank Gerace, filed this action seeking a declaration that these provisions of the Casino Control Act may not constitutionally be enforced against them. Plaintiffs also seek injunctive relief and damages. It is pleaded that application of the Act against the plaintiffs is preempted by the National Labor Relations Act of 1935, *infra*, the Labor-Management Reporting and Disclosure Act of 1959, *infra*, and the Employee Retirement Income and Security Act of 1974, *infra*, and that the Act is thereby invalidated under the Supremacy Clause of the Constitution. U.S.C.A.Const. Art. VI, cl. 2 (West 1968). Plaintiffs also plead that the Act is vague and overbroad, that it is invalid under the First and Fourteenth Amendments and under the Contract Clause. U.S.C.A.Const. Art. I, § 10 (West 1968). The case is currently before the court on a motion for a preliminary injunction, in support of which plaintiffs have advanced their arguments under the Supremacy Clause, their vagueness and overbreadth claims and their First Amendment claims.

## I. BACKGROUND

Pursuant to the power granted it by the Constitution of the State of New Jersey, N.J.Stat.Ann.Const. Article 4, § 7, ¶ 2 D (West Supp.1981), the New Jersey Legislature enacted the Casino Control Act, *supra*, in 1977, establishing the conditions under which casino gambling in Atlantic City would be conducted and controlled. The Act establishes the Casino Control Commission in the Department of Treasury, N.J. Stat.Ann. § 5:12–5 (West Supp.1981), and the Division of Gaming Enforcement in the Department of Law and Public Safety. N.J.Stat.Ann. § 5:12–55 (West Supp.1981). The Casino Control Commission is charged with the duties of passing on applications for licenses, N.J.Stat.Ann. §§ 5:12–63 and –64 (West Supp.1981), and the Division of Gaming Enforcement is empowered to investigate the qualifications of applicants for licenses, and to present its views on such applications to the Commission. N.J.Stat. Ann. §§ 5:12–76 through –79 (West Supp. 1981).

In connection with the development of casino gambling in Atlantic City, the Legislature has found and declared seventeen aspects of "the public policy of this State," and has listed them in § 1 of the Act. N.J.Stat.Ann. § 5:12–1 b (West Supp.1981). It is in consonance with these aspects of public policy that the Act is likely to be enforced. *New Jersey Builders Owners and Managers Association v. Blair*, 60 N.J. 330, 338, 288 A.2d 855 (1972). The ones which are most pertinent to this court's inquiry are as follows:

(6) An integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations. To further such public confidence and trust, the regulatory provisions of this act are designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises and all related service industries as herein provided. In addition, licensure of a limited number of casino establishments, with the comprehensive law-enforcement supervision attendant thereto, is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process.

(7) Legalized casino gaming in New Jersey can attain, maintain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insures, so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations, and the exclusion or removal from any positions of authority or responsibility within casino gaming operations and establishments of any persons known to be so deficient in business probity, ability or experience, either generally or with specific reference to gaming, as to create or enhance the dangers of unsound, unfair or illegal practices, methods and activities

in the conduct of gaming or the carrying on of the business and financial arrangements incident thereto.

\* \* \* \* \* \*

(9) Since casino operations are especially sensitive and in need of public control and supervision, and since it is vital to the interests of the State to prevent entry, directly or indirectly, into such operations or the ancillary industries regulated by this act of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of this State, the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid entry of such persons into the casino operations or the ancillary industries regulated by this act.

\* \* \* \* \* \*

(13) It is in the public interest that the institution of licensed casino establishments in New Jersey be strictly regulated and controlled pursuant to the above findings and pursuant to the provisions of this act, which provisions are designed to engender and maintain public confidence and trust in regulation of the licensed enterprises, to provide an effective method of rebuilding and redeveloping existing facilities and of encouraging new capital investment in Atlantic City, and to provide a meaningful and permanent contribution to the economic viability of the resort, convention, and tourist industry of New Jersey.

\* \* \* \* \* \*

(15) Continuity and stability in casino gaming operations cannot be achieved at the risk of permitting persons with unacceptable backgrounds and records of behavior to control casino gaming operations contrary to the vital law enforcement interest of the State.

N.J.Stat.Ann. § 5:12–1 b (West Supp.1981).

These declarations reveal a serious concern with the possibility that casino gambling in Atlantic City—along with the governmental entities which are bound to control it—has the potential to serve as a vehicle for the violence, extortion and lawlessness which have plagued gaming industries in other contexts. The Legislature had before it many studies on the possibilities for corruption and crime which might have been created by the introduction of legalized gaming. *E.g., Second Interim Report of the New Jersey Governor's Staff Policy Group on Casino Gambling* (Feb. 17, 1977); *Report and Recommendations by the State Commission of Investigation* (April 1977). The reports were based on studies of gaming industries around the world and in other states. *See Second Interim Report of the Staff Policy Group, supra.* Numerous public hearings on the matter were also held. Certainly it was no puritanical aversion to games of chances which brought the Legislature to the conclusion that strict control over all aspects of the new industry would be necessary to prevent it from befouling all that it touched and all that touched it. It is unquestioned that the history of legalized gambling in all of its forms demonstrates that it is extraordinarily susceptible to control and abuse by criminals employing methods of violence and bribery. *Id.;* National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, *The Development of the Law of Gambling: 1776–1976* (1977). The roots of corruption, spread far enough, can undermine the very foundations of public confidence in government itself, and the recitations of public policy in the Act show an awareness of this.[1] Accordingly, a comprehensive licensing system was established, which extended not only to those who were to own, manage and be employed by casinos, but also to ancillary services, such as the supplying of gaming devices. N.J.Stat.Ann. §§ 5:12–80 through –95.11 (West Supp.1981).

Labor organizations are not immune to the possibilities of corruption. The Governor's Staff Policy Group reported, "Both

---

1. "The whore and gambler, by the state Licensed, build that nation's fate."

Wm. Blake, *Auguries of Innocence*, (Pickering Manuscripts, *c.* 1801).

legally recognized and unrecognized employee organizations have been reported to be a source of corruption in other jurisdictions." *Second Interim Report, supra,* at 46. The State Commission of Investigation reported that there were:

few better vehicles utilized by organized crime to gain a stranglehold on an entire industry than labor racketeering. Organized crime control of certain unions often requires the legitimate businessmen who employ the services of the union members to pay extra homage to the representatives of the underworld. Moreover the ready source of cash which union coffers provide can be employed as financing of all sorts of legitimate or illicit ventures.

*Report and Recommendations, supra,* at 2. It can not be doubted that the large number of unrecorded transactions which are associated with gambling can multiply the effects of the phenomenon described by the Commission of Investigation. In enacting the Racketeer Influence and Corrupt Organizations (RICO) Act, 84 Stat. 941, 18 U.S.C.A. §§ 1961 *et seq.* (West Supp.1981), in 1970, Congress recognized the explosiveness of the combination of labor racketeering and gambling by declaring:

[O]rganized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitations; . . . this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions. . . .

Pub.L. 91–452, § 1, *reprinted following* 18 U.S.C.A. § 1961 (West Supp.1981).

Similar to the licensing provisions discussed above is § 93 of the Act, which requires that "[e]ach labor organization, union or affiliate seeking to represent employees licensed under this act and employed by a casino hotel or a casino licensee shall register with the commission annually. . . ." N.J.Stat.Ann. § 5:12–93 a (West Supp. 1981). Although the registration require-

ment differs in some respects from the licensing requirement which applies to casino service industries, N.J.Stat.Ann. § 5:12–92 (West Supp.1981), or casino hotel employees, N.J.Stat.Ann. § 5:12–91 (West Supp. 1981), its effect is similar to the licensing requirement. Section 93 goes on to state that officers, agents and principal employees of the labor organization, union or affiliate required to register must pass muster under § 86 of the Act, which lists criteria for disqualification of applicants for licenses. N.J.Stat.Ann. §§ 5:12–86 and 93 b (West Supp.1981). Failure of key employees of such a union to meet the standards of § 86 does not bar the union from acting as the collective bargaining representative of the licensed employees, but it does visit certain other restrictions on the union; *i.e.,* the union is forbidden to receive any dues from any licensed casino employee, and is also forbidden to "administer any pension or welfare funds." N.J.Stat.Ann. § 5:12–93 b (West Supp.1981). As with hotel employee licenses, N.J.Stat.Ann. § 5:12–91 e (West Supp.1981), the Casino Control Commission is given discretion to "waive any disqualification criteria [of § 86] consistent with the public policy of this act and upon a finding that the interests of justice so require." N.J.Stat.Ann. § 5:12–93 b (West Supp.1981).

No one involved in these proceedings has argued that it was irrational for the Legislature to decide to subject representatives of licensed employees to some form of regulation and control. The wisdom of the legislation is not here at issue. The question is a narrower one of the scope within which the state's regulation of such unions is permitted to operate by the Constitution, the breadth of the inquiries which may be made, and the nature of the sanctions which may be applied.

We start with the premise that the state's regulation of gambling is subject to constitutional limitations. *Bally Manufacturing Corp. v. Casino Control Commission,* 534 F.Supp. 1213, 1220 (D.N.J.1982); *Marshall v. Sawyer,* 301 F.2d 639 (9th Cir. 1962). The argument of the Division of Gaming

Enforcement that constitutional scrutiny of the regulations at issue is barred by the Tenth Amendment[2] is weakly supported. In *State v. Rosenthal*, 93 Nev. 36, 559 P.2d 830, *appeal dismissed*, 434 U.S. 803, 98 S.Ct. 32, 54 L.Ed.2d 61 (1977), it was stated that this view was unnecessary to the decision of the case. Other courts have proceeded on the assumption that Congress may regulate gambling insofar as it affects the flow of interstate commerce, as it does here, and in so doing may preempt the power of the states to do the same. *See Marshall v. Sawyer, supra*, 301 F.2d at 649 n.3 (Pope, J., dissenting). It was not many years ago that Congress had prevented the states from running their own lotteries as they saw fit. *Development of the Law of Gambling, 1776–1976, supra*, at 539 *et seq.* The defendants' incantation of the word "gambling" does not prevent the application of federal constitutional standards to the actions of the state.

## II. FINDINGS OF FACT

The facts essential to the determination of the motion are as follows:

1. Plaintiff Hotel and Restaurant Employees and Bartenders International Union Local 54 is an unincorporated labor organization within the meaning of § 2(5) of the National Labor Relations Act, as amended, *infra*, representing, *inter alia*, about 8,000 licensed employees of the casinos and casino hotels in Atlantic City, New Jersey, in collective bargaining and other matters affecting employer-employee relations. Plaintiff Frank Gerace is president of Local 54.

2. Frank Gerace is a trustee of the Hotel Employees and Restaurant Employees and Bartenders International Union Pension Fund, as well as the Hotel Employees and Restaurant Employees and Bartenders International Union Health & Welfare Fund. Local 54, through its officers, participates in the operation of these funds, both of which are employee benefit plans within the meaning of the Employee Retirement

Income Security Act of 1974, *infra.* (Plaintiffs' Exhibit 5).

3. Local 54 filed its annual registration statement as required by the Casino Control Act in 1978. On May 12, 1981, the defendant Division of Gaming Enforcement, following its investigation of the applicant, stated its objections to the application. (Plaintiffs' Exhibit 2).

4. The Casino Control Commission thereupon ordered that hearings on the subject of Local 54's registration commence on September 9, 1981. (Affidavit of Frank Gerace, August 17, 1981, ¶ 2; Defendants' Exhibit 3).

5. Local 54 has posed to the Casino Control Commission certain of its objections to the registration requirement, the conduct of its officers being the subject of a hearing, and to the possibility that the sanctions of § 93 of the Casino Control Act may be imposed. (Plaintiffs' Exhibit 4). The Commission has held that it is without jurisdiction to reach the constitutional objections to § 93. (Plaintiffs' Exhibit 4).

6. The Casino Control Commission has adjourned the hearing scheduled for September 9, 1981, pending determination of the instant motion for preliminary relief. (Defendants' Exhibit 3).

## III. JURISDICTION

■ Having raised the question of whether the Casino Control Act is preempted by federal statutes regulating commerce, plaintiffs have properly invoked 28 U.S. C.A. § 1331 (West Supp.1981) and 28 U.S. C.A. § 1337 (West Supp.1981) as sources for this court's jurisdiction. *Cab Operating Corp. v. City of New York*, 243 F.Supp. 550, 552 (S.D.N.Y.1965). The allegations concerning denial of rights granted by the First and Fourteenth Amendments support our jurisdiction under 28 U.S.C.A. § 1343 (West Supp.1981).

Defendants argue that we should apply the principle of abstention and decline to

2. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S.C.A.Const. Amend. X (West 1972).

exercise our jurisdiction in this case.[3] We are told that under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), we may not interfere with the state's administrative hearings by enjoining them. Additionally, the defendants invoke the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Alabama Public Service Commission v. Southern Railway*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1950). They argue that *Burford* abstention is required because this case presents complex questions of state law which relate to matters of substantial public import, the resolution of which might be disruptive of state efforts to implement a coherent regulatory framework. The final ground for abstention is based on the argument that the questions here presented should first be brought to state tribunals, which would then have the opportunity to construe the Casino Control Act in a way which might obviate the necessity for a decision of the federal constitutional questions or substantially modify the constitutional issue. This argument is based on *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See generally*, 1A, Pt. 2 Moore's Federal Practice, ¶ 0.203 *et seq.* (2d Ed.1981).

■ The *Younger* doctrine does not apply to this case. The rule which restricts the federal courts' power to enjoin state proceedings is applicable only to those proceedings which are initiated by the state. *Johnson v. Kelly*, 583 F.2d 1242, 1247, 1249 (3rd Cir. 1978); *Bally Manufacturing Corp. v. Casino Control Commission*, 534 F.Supp. 1213, 1218–20 (D.N.J.1982); *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 145 (E.D.Pa.1977). It is recognized that on this motion the plaintiffs seek to restrain the hearings which were, in fact, scheduled at the instance of the Casino Control Commission. Nevertheless, the entire registration procedure is one which is initiated by the

applicant, and it is the validity of the entire procedure which is in question in this case.

■ Nor is the *Burford* doctrine applicable to this case. This court's recent opinion in *Bally Manufacturing Corp. v. Casino Control Commission, supra*, at 1222–23 explained why *Burford* was inapplicable in a similar case. While there are some differences between the procedural postures of that case and the one at hand, it remains true that the questions of state law are neither so technical nor so complex as to require abstention. We do not think that constitutional scrutiny, which inevitably must be applied to the statute, would so seriously disrupt the functioning of the state's policies as to counsel more delay of that scrutiny than would otherwise be required.

■ The most forceful arguments counseling abstention emanate from the line of cases beginning with *Pullman, supra*. Our inquiry under *Pullman* is to determine whether the federal issues may be avoided as a result of a state court's construction of the Casino Control Act. To a large extent the decision on whether to abstain depends on the nature of the federal question presented. Where several federal questions are presented, as here, some of the questions may be avoidable and others unavoidable. The court must consider the applicability of the *Pullman* doctrine to each of the federal claims separately, and will discuss the matter more fully in connection with the discussion of the merits of each of the questions presented.

## IV. DISCUSSION and CONCLUSIONS OF LAW

To prevail on a motion for preliminary injunctive relief, the moving party must show that it has a reasonable likelihood of eventual success in the litigation, that it will be irreparably injured *pendente lite* if the preliminary relief is not granted, that a

---

**3.** Plaintiffs suggested at oral argument that the abstention issue should not be reached because defendants had filed no motions for dismissal on the grounds of abstention. Such a motion was subsequently filed. Since abstention goes to questions of the court's jurisdiction, we may consider the issue on our own motion. Rule 12(h)(3), Fed.R.Civ.P. The issue was fully briefed and argued by both sides, and deferral of the issue would serve no purpose.

balance of equities favors the party seeking preliminary relief, and that the public interest will not be disserved by the issuance of the preliminary injunction. *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3rd Cir. 1978), and cases cited therein; *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1352–53 (D.N.J. 1981). The court will discuss each of the plaintiffs' claims with these standards in mind.

### A. *Preemption of the Casino Control Act by Federal Labor Legislation*

The plaintiffs claim that § 93 of the Casino Control Act conflicts with Congressional enactments dealing with labor relations, including those portions of the federal statutes which are intended to guarantee to employees the right to select collective bargaining representatives of their own choosing. The possibility that Local 54 will be prevented from collecting dues and administering pension, health and welfare funds is said to create a direct impediment to effectuation of the rights of self-organization guaranteed to employees by § 7 of the National Labor Relations Act of 1935, *infra*, 29 U.S.C.A. § 157 (West 1973). This section states that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, . . . .

*Id.*

■ The Supremacy Clause of the Constitution, U.S.C.A.Const. Art. VI, cl. 2 (West 1968), provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *Id.* State provisions which conflict with federal laws are without effect. *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). It was recently stated by the Supreme Court that consideration under the Supremacy Clause must start "with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 516 (1981); *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Congressional intent to supersede the power of a state to pass a particular regulation may be found, however, where the scheme of federal regulation is so pervasive that there is no room for state regulation in the same field, or where the state regulation may produce a result inconsistent with the objective of the federal statute. *Rice v. Santa Fe Elevator Corp., supra*, 331 U.S., at 230, 67 S.Ct., at 1152. A state enactment may be void to the extent that compliance with both the federal and state statutes is impossible or where the statute frustrates Congressional goals. *See generally, Maryland v. Louisiana*, supra, 451 U.S., at 746–47. Where preemption is the issue, "each case turns on the peculiarities and features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973) *citing Hines v. Davidowitz, supra*, and *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

Plaintiffs argue that § 1 of the National Labor Relations Act of 1935 (the "NLRA" or the "Wagner Act"), 49 Stat. 449, as amended 61 Stat. 136, 29 U.S.C.A. § 151 (West 1973), along with § 2 of the Labor-Management Reporting and Disclosure Act of 1959 (the "Landrum-Griffin Act" or the "LMRDA"), 73 Stat. 519, 29 U.S.C.A. § 401 (West 1975), evince a Congressional intention that protection of employees' ability to choose their bargaining representatives be exclusively a federal concern, not to be interfered with by state enactments such as the one under consideration in this case. These two sections are statements of federal policy which must be considered in determining the preemptive reach of the acts. Section 1 of the Wagner Act states in part:

It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C.A. § 151 (West 1973). In § 2 of the LMRDA Congress stated:

The Congress finds that, in the public interest, it continues to be the responsibility of the Federal Government to protect employees' rights to organize, choose their own representatives, bargain collectively, and otherwise engage in concerted activities for their mutual aid or protection. . . .

29 U.S.C.A. § 401(a) (West 1975). Of course, the more substantive portions of these enactments must also be considered.

Section 504 of the Landrum-Griffin Act, 29 U.S.C.A. § 504 (West 1975), operates as a restraint against certain persons from acting as key employees or leaders of labor organizations, much in the same way as does § 93 of the Casino Control Act, when applied in conjunction with § 86 of the Act. Section 504 bars persons convicted of certain enumerated crimes from serving in such positions for five years following their convictions or the end of their imprisonment unless certain prerequisites relating to pardon or parole have been met. The Casino Control Act lists more crimes than are listed in § 504, and extends the disability to ten years. *See* N.J.Stat.Ann. § 5:12–86c(1), (2), (3), (4) (West Supp.1981). It is argued that the Congressional policy statements quoted above should lead us to conclude that the bars erected by § 504 may only be enforced in the manner provided by the federal enactment. Alternatively, plaintiffs state that even if the states may establish their own mechanisms for enforcing provisions similar to § 504, the enumeration of disabilities in § 504 is exclusive, and may not be extended by state laws such as the Casino Control Act.

The merits of plaintiffs' argument that application of the Casino Control Act to them is barred by the LMRDA, including § 504 and § 1, *supra*, are easily disposed of by reference to *DeVeau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). In that case the Supreme Court considered whether § 8 of the New York Waterfront Commission Act of 1953 was preempted by the NLRA and the Landrum-Griffin Act. The act there examined was enacted pursuant to a bistate compact approved by Congress in 1953 under Article I, § 10 of the Constitution, the Compact Clause. U.S.C.A.Const. Art. I, § 10, cl. 3 (West 1968). It established a system for licensing employees on the waterfront of the Port of New York. *DeVeau v. Braisted, supra,* at 147–51, 80 S.Ct. at 1148–50. Section 8 thereof provided that no person could collect dues from licensed waterfront employees on behalf of any labor organization if any officers or agents of the labor organization had ever been convicted of any felony, unless those officers or agents had been pardoned or paroled. *DeVeau, supra,* at 145, 80 S.Ct. at 1147. Like the Casino Control Act, the legislation under attack in *DeVeau v. Braisted* was more comprehensive in its restriction on employees' freedom to choose bargaining representatives than § 504 of the LMRDA. In explaining why the Waterfront Commission Act was not preempted by the LMRDA, the Court, in an opinion by Mr. Justice Frankfurter, stated:

The fact that Congress itself has . . . imposed the same type of restriction upon employees' freedom to choose bargaining representatives as New York seeks to impose through § 8, namely, disqualification of ex-felons for union office, is surely evidence that Congress does not view such a restriction as incompatible with its labor policies. Appellant, however, argues that any state disablement from holding union office on account of a prior felony conviction, such as § 8, which has terms at variance with § 504(a), is im-

pliedly barred by it. Just the opposite conclusion is indicated by the 1959 Act, which reflects congressional awareness of the problems of pre-emption in the area of labor legislation, and which did not leave the solution of questions of pre-emption to inference. When Congress meant pre-emption to flow from the 1959 Act it expressly so provided. Sections 205(c) and 403, set out in the margin,[2] are express provisions excluding the operation of state law, supplementing provisions for new federal regulation. No such pre-emption provision was provided in connection with § 504(a). That alone is sufficient reason for not deciding that § 504(a) pre-empts § 8 of the Waterfront Commission Act. In addition, two sections of the 1959 Act, both relevant to this case, affirmatively preserve the operation of state laws. That § 504(a) was not to restrict state criminal law enforcement regarding the felonies there enumerated as federal bars to union office is provided by § 604 of the 1959 Act: "Nothing in this Act shall be construed to impair or diminish the authority of any State to enact and enforce general criminal laws with respect to [the same group of serious felonies, with the exception of exclusively federal violations, which are listed in § 504(a)]." And to make the matter conclusive, § 603(a) is an express disclaimer of pre-emption of state laws regulating the responsibilities of union officials, except where such pre-emption is expressly provided in the 1959 Act. Section 603(a) provides: "Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization ... under the laws of any State ...." In view of this explicit and elaborate treatment of pre-emption in the 1959 Act, no inference can possibly arise that § 8 is impliedly pre-empted by § 504(a).

2 Section 205(c) provides:
"... No person shall be required by reason of any law of any State to furnish to any officer or agency of such State any information

included in a report filed by such person with the Secretary pursuant to the provisions of this title, if a copy of such report, or of the portion thereof containing such information, is furnished to such officer or agency...."
Section 403 provides:
"No labor organization shall be required by law to conduct elections of officers with greater frequency or in a different form or manner than is required by its own constitution or bylaws, except as otherwise provided by this title.... The remedy provided by this title for challenging an election already conducted shall be exclusive."
*Id.,* at 156–57, 80 S.Ct. at 1152–53.

■ The opinion of Mr. Justice Brennan is to the very same effect: "[T]he Labor-Management Reporting & Disclosure Act of 1959 explicitly provides that it shall not displace such legislation of the States." *Id.,* at 160–61, 80 S.Ct. at 1154–55. It is to be noted that the Court's analysis of the Waterfront Commission Act's relationship to the LMRDA does not in any way turn on the circumstance that Congress had approved the bistate compact dealing with labor corruption on the piers. The Court considered Congressional approval of the compact only insofar as it may have diminished the preemptive reach of the Wagner Act. *Id.,* at 151–55, 80 S.Ct. at 1150–52. Therefore, plaintiffs' argument that *DeVeau* must be confined to situations where Congress has explicitly made exceptions to the asserted preemptive effect of the Landrum-Griffin Act is insupportable. Justice Frankfurter's reading of the history and purpose of the LMRDA has been subject to some criticism, *see DeVeau, supra,* at 161–65, 80 S.Ct. at 1155–58 (Douglas, J., dissenting); Note, *State Regulation of Casino Gambling: Constitutional Limitations and Federal Labor Law Preemption,* 49 Fordham L.Rev. 1038, 1053–56 (1981), but it is not subject to question by this court. *Spindel v. Spindel,* 283 F.Supp. 797, 802 (E.D.N.Y.1968). We are required to hold that plaintiffs are not likely to succeed on the merits of their claim that the Casino Control Act is preempted by the LMRDA.

Plaintiffs' claim that the Casino Control Act is preempted by the NLRA is considerably more problematic. The starting point for this argument is *Hill v. Florida,* 325 U.S.

538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945). In that case, the Court upheld·a challenge to a state law which required each labor union operating in the state to file a written report, accompanied by a filing fee of $1.00, with Florida's Secretary of State listing the names and addresses of its officers. The law further prohibited any person from acting as a business agent for any union unless the person were granted a license by the State. A business agent licensee was required to pay a $1.00 license fee, to show that he was a person of good moral character, and to show that he had not been convicted of a felony. Neither the union nor its business agent had complied with the registration requirement, and they had been enjoined from operating as such by the Florida courts. *Id.*, at 539–41, 65 S.Ct. at 1374.

The Court reversed the decree of the Supreme Court of Florida affirming the lower court's decree granting injunctive relief. It was held:

> The requirement as to the filing of information and the payment of a $1.00 annual fee does not, in and of itself, conflict with the Federal Act. But for failure to comply, the union has been enjoined from functioning as a labor union. . . . It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with the federally protected process of collective bargaining.

*Id.*, at 543, 65 S.Ct. at 1375.

This passage reveals that *Hill v. Florida* should be considered in light of the unique posture of that case. In our own case, neither the union nor its officers have been enjoined from any of their activities. During the pendency of this litigation, and during the pendency of the hearings which they seek to have enjoined, plaintiffs will continue to represent casino employees and others, operating as they have in the past. The significance of the difference between the situation presented here and the one presented in *Hill v. Florida* is borne out by *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945), decided on the same day

as *Hill*. In that case a similar statute was challenged by persons who had neither registered nor been enjoined. The Court declined to rule on the constitutionality of the statute there in question, saying:

> . . . [W]e cannot assume that the failure to file reports will result in the exclusion of petitioners, or any of them, from functioning in the state, or visit any consequences upon them other than the penalty for failure to file. We therefore have no question before us of a statute which has been construed to operate either by its penal sanctions or by the aid of.injunction to prevent petitioners, or any of them, from functioning within the state for noncompliance with sec. 7 [of the state enactment]. *Compare Hill v. Florida*, 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed. 1782] (1945). Nor can we say in the absence of any showing to the contrary that the filing of information returns will impose such burdens on any of petitioners as to interfere with the performance of their functions under the National Labor Relations Act in cases where that Act is applicable. . . .
>
> We can be asked to condemn a state statute as in conflict with national legislation only if the conflict is clearly shown, *Allen-Bradley Local v. Wisconsin Employment Relations Board*, 315 U.S. 740, 749 [62 S.Ct. 820, 875, 86 L.Ed. 1154] (1942); *Townsend v. Yeomans*, 301 U.S. 441, 454 [57 S.Ct. 842, 848, 81 L.Ed. 1210] (1937), and cases cited, and only by those who show that they are adversely affected by the alleged conflict with national power. Each of the contentions which petitioners make with respect to the conflict of sec. 7 and 16 [of the state enactment] with the National Labor Relations Act could readily be adjudicated and disposed of in an adversary suit drawing in question their validity as applied to specific states of fact, in which respondents could both challenge the facts and the applicability to them of the statute.

*Id.*, at 466, 65 S.Ct. at 1392 (citations recast). Our case is similar to *Alabama State Federation of Labor v. McAdory, supra,* because there is considerable doubt as to

whether plaintiffs will ever be enjoined from or otherwise interfered with in carrying out their union functions. The inquiry into the qualifications of the union and its leaders may not be considered to visit irreparable harm on the plaintiffs; something further must befall them before preemption may be found.

It has been held many times that Congressional intent to preempt state laws is not to be readily or incautiously inferred. *E.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973). Further, we are not to "seek our conflicts between state and federal regulation where none clearly exists." *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960). *See also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978); *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 45, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336 (1966). This much is clear from *Alabama State Federation of Labor v. McAdory, supra*, as well. There is presently no interference with plaintiffs' ability to function as a labor union or as its president. Nor will there be any such interference during the pendency of the hearing scheduled by the Casino Control Commission. Our examination of the Casino Control Act shows that actual interference with the purposes of the federal enactments is entirely avoidable.

The Commission may find, after a hearing, that the officers of Local 54 meet the qualifications established by § 86, and that the union will not be placed under the restrictions which may be imposed by section 93. Alternatively, the Commission may decide to permit Local 54's agents to collect dues and administer pension funds even though some of Local 54's personnel do not meet the qualifications established by § 86. Section 93 specifically provides:

> The commission may for the purposes of this subsection waive any disqualification criterion consistent with the public policy of this act and upon a finding that the interests of justice so require.

N.J.Stat.Ann. § 5:12–93 b (West Supp. 1981). It is reasonable to assume that the Commission would exercise the discretion granted by this provision if it were presented with a situation where the imposition of the sanctions provided for in § 93 would create a conflict with federal legislation. Not only is it clear that the Commission may waive the disqualifications of § 86, it is also evident that the Commission may fashion a sanction which is of lesser magnitude than those explicitly provided for in § 93. In *Bally Manufacturing Corp. v. Casino Control Commission*, 534 F.Supp. 1213 (D.N.J.1982), this court was presented with a case in which the Casino Control Commission granted a license to a corporation conditioned on severance of all relationships between the corporation and one of its officers. *Id.*, at 1215. The question of whether the Commission might permissibly fashion a similar order after the hearing on Local 54's application is not before us.

With these considerations in mind, it is easy to see how this case falls squarely within the holding of *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966). In that case appellants were challenging the constitutionality of a New York law dealing with the control of liquor prices. Appellants argued that meeting the requirements established by the New York law would have required them to violate federal antitrust laws. The Court rejected this argument, taking note of a section of the New York law which gave the state administrator discretion to modify the requirements complained of. The section provided that liquor could not be sold "except at the price and discounts then in effect unless prior written permission of the authority is granted for good cause shown and for reasons not inconsistent with the purpose of this chapter...." *Quoted*, 384 U.S., at 46 n.16, 86 S.Ct. at 1261–62 n.16. The Court stated: "We cannot presume that the Authority will not exercise that discretion to alleviate any friction that might result should the [state enactment] chafe against the Robinson-Patman Act or any other federal statute." *Id.*, at 46, 86 S.Ct. at 1261–62. In the face of a similar

kind of discretion granted to the Casino Control Commission by § 93 b, we cannot depart from this holding. We are required to presume that the Commission will exercise its discretion appropriately.

Plaintiffs have maintained that there is no room for discretion in this case. They argue that because the selection of collective bargaining agents through elections is an activity protected by § 7 of the Wagner Act, *supra*, the case falls within *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), where it was held:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the NLRA, or constitute an unfair labor practice under § 8, due regard for the federal enactment required that state jurisdiction must yield....

*Id.*, at 244, 79 S.Ct. at 779.

The *Garmon* rule is not pertinent to this motion for two reasons. First, *Garmon* does not overrule *Hill v. Florida, supra*, and *Alabama State Federation of Labor, supra*, to the extent that they require a holding of preemption to be based on actual and substantial interference with the federal program by the state. Secondly, this court is convinced that our case falls within the line of cases where a less strict approach to preemption than that in *Garmon* is taken. In *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Court discussed its historical recognition of exceptions to the *Garmon* rule in appropriate cases:

> We have refused to apply the pre-emption doctrine to activity that otherwise would fall within the scope of *Garmon* if that activity "was a merely peripheral concern of the Labor Management Relations Act ... [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we would not infer that Congress had deprived the States of the power to act."

*Id.*, at 296–97, 97 S.Ct. at 1061–62. (citation omitted). *See also Sears, Roebuck & Co. v. San Diego District Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978).

We need not question at this juncture that the regulation of gambling is a matter "deeply rooted in local feeling and responsibility." *Farmer v. Carpenters, supra*, 430 U.S. at 296, 97 S.Ct. at 1061. We have already discussed the historical reasons why gambling has been considered anathema in the overwhelming majority of jurisdictions unless it has been subject to strict control. The case of *United States v. Dixon*, 25 F.Cas. 872 (C.C.D.C.1830), discusses extensively the historical background whereby gambling was enjoinable at equity under the doctrine of nuisance. *See generally, The Development of the Law of Gambling: 1776–1976, supra.*

▪ It is important to note that in the cases which have allowed room for regulation of activities "deeply rooted in local feeling and responsibility," there has always been an analysis of whether the state has tailored its regulations so as to show a due regard for the federal interests in activities sanctioned by the labor legislation. In *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Court held that a cause of action under state law could be stated for a libelous statement made in the course of an organizational campaign. The Court there adopted the standards set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to such libel actions, however, in order to minimize the possibility that the threat of such suits would inhibit free discussion during labor disputes. *Linn v. Plant Guard Workers, supra*, 383 U.S. at 64–65, 86 S.Ct. at 665. In *Farmer v. Carpenters, supra*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 the Court examined whether the state court had minimized the potential for interference with the federal scheme of labor regulation during the course of an action for intentional infliction of emotional distress. It is reasonable to assume that if the Commission is

faced with the possibility of sanctioning conduct of the plaintiffs which may have been protected by the National Labor Relations Act or by the LMRDA, it will engage in similar consideration in order to avoid needless friction between the state and federal programs. We are not at liberty to say that they will not do so. Accordingly, we must hold that the plaintiffs' claim of likelihood of success on the merits and irreparable harm *pendente lite* are speculative.

We may not find that there is irreparable harm simply because the hearings might lead to bad publicity about the union and its leaders, as they argue. In the case of *Cab Operating Corp. v. City of New York*, 243 F.Supp. 550 (S.D.N.Y.1965), it was held that irreparable harm could be found where a representation election required by a municipal ordinance would interfere with a later federally sanctioned representation election. It was said in that case that the publication of the results of the first election would likely affect the outcome of the second election. It has not been shown that an election involving Local 54 is impending in the immediate future, and we do not decide whether *Cab Operating Corp., supra*, would be applicable here if such an election were so scheduled.

This court's consideration of the public interest and the potentiality of harm to the defendants were a preliminary injunction to be issued leads the court to conclude that the plaintiffs' motion should not be granted on the basis of plaintiffs' claim that the state enactment is preempted by the labor legislation of Congress. It would be better to permit the regulatory mechanism to run its course, with the defendants left to their effort to apply the statute in a constitutionally permissible manner as they see fit.

A word on abstention is appropriate. The central issue of this motion is whether the plaintiffs are subject to the registration and hearing requirements of § 93 of the Casino Control Act. The question of the permissibility of the various sanctions and qualifications which might in the future be applied to the plaintiffs is not squarely at issue. The Casino Control Act clearly states that "[e]ach labor organization . . . *shall* register with the commission annually." N.J.Stat.Ann. § 5:12–93 a (emphasis added). The chances that a state court would interpret this dictate so as to exempt the plaintiffs as a matter of state law from the registration requirement appear to be slight or nonexistent. It has not been argued that there is any chance that the state courts might construe the statute so as to avoid the need for this court to decide whether the plaintiffs must be the subject of a hearing. When "the statute is obviously applicable to the plaintiff and his course of conduct or when the statute is not susceptible to a construction that will otherwise avoid the necessity of deciding a constitutional question, a federal court may not properly stay its hand." *United Steelworkers of America, AFL–CIO v. Bagwell*, 383 F.2d 492, 495 (4th Cir. 1967) (footnote omitted). For this reason, abstention is inappropriate.

### B. Preemption of the Casino Control Act by the Employee Retirement Income Security Act of 1974

Plaintiffs' next asserted ground for the issuance of a preliminary injunction is that the Casino Control Act is preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U.S.C.A. §§ 1001 *et seq.* (West 1975). ERISA was enacted to protect individual pension rights, and to establish a federal scheme for regulation of the private pension system. See H.R.Rep. No. 93–533, 93d Cong., 2d Sess. 1–5, Oct. 2, 1973, *reprinted in* [1974] U.S. Code Cong. & Ad. News 4639, 4639–43. It has long been accepted that the establishment and administration of employee benefit plans are partly the responsibility of labor unions. *Inland Steel Company v. NLRB*, 170 F.2d 247 (7th Cir. 1948), *cert. denied*, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). The facts set out, *ante*, indicate that Local 54 and its president, Frank Gerace, are active in the administration of employee benefit plans for the benefit of members of Local 54. These are benefit plans within the meaning of the definitional section of ERISA. 29 U.S.C.A. § 1002 (West 1975).

Plaintiffs argue that the Casino Control Act is preempted by ERISA because of the potential for interference with the scheme established by ERISA. First, § 93 envisions the removal of plaintiff Gerace from his position as a member of the board of directors of the funds. Second, it is argued that if the union and its agents are prohibited from collecting contributions for the benefit plan, then the plans will be unable to meet their obligations to the people who are entitled to receive benefits therefrom.

The language used by Congress to establish the preemptive effect of ERISA is more comprehensive than Congress usually employs. Section 514 of ERISA, 29 U.S.C.A. § 1144 (West 1975), provides in relevant part:

> (a) Except as provided in subsection (b) of this section, the provisions of this subchapter [*i.e.,* 29 U.S.C.A. §§ 1001–1144] . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title . . . .

> (b)(4) Subsection (a) of this section shall not apply to any generally applicable criminal law of a State.

> (c) For the purposes of this section: . . .

> (2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

*Id.*

The legislative history of the preemption provisions of ERISA is discussed at some length in *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), *affirmed*, 571 F.2d 502 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978), and in *Bell v. Employee Security Benefit Association*, 437 F.Supp. 382 (D.Kan.1977). These cases indicate that § 514 should be broadly construed. Along with this provision, we must also take note of § 411 of ERISA, 29 U.S.C.A. § 1111 (West 1975), which, similarly to § 504 of the LMRDA, discussed above, prohibits any person convicted or imprisoned from serving as "an administrator, fiduciary, officer, trustee, custodian, agent, or employee of any employee benefit plan," 29 U.S.C. § 1111(a)(1) (West 1975), for five years after the conviction or imprisonment. ERISA contains no provision similar to § 603 of the LMRDA, 29 U.S.C.A. § 523 (West 1975), which is quoted in part in the portion of *DeVeau v. Braisted* set out *ante,* at pp. 327–328.

Although the language of § 514 of ERISA is broad, we cannot say that it warrants a holding that the application of the Casino Control Act in the case at hand is preempted by ERISA. The language does not call for the courts to invalidate a state law every time its potential application raises the mere spectre of interference with ERISA's scheme. The outer bounds of the preemptive effect of ERISA have not been determined, *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981), nor should they be in the context of this motion. Section 514 does not give us leave to depart from the well established rules counseling restraint in finding preemption in the absence of a pressing and unavoidable conflict between the state and federal programs. *Alessi v. Raybestos-Manhattan, Inc., supra*, at 521–22, 101 S.Ct. at 1905–06.

It has already been explained why the discretion which is supplied to the Casino Control Commission by the Act will give the Commission the flexibility required to avoid any conflict with the objectives of Congressional labor legislation. The same considerations dictate the denial of preliminary relief on the basis of plaintiffs' claim that the Casino Control Act is preempted by ERISA.

### C. *First Amendment, Vagueness and Overbreadth*

Plaintiffs advance two arguments to support their claim that application of the Casino Control Act to them would violate the First Amendment and the Due Process clause of the Fourteenth Amendment. The

first argument deals with the portion of § 93 which may be used to prevent the collection of union dues. It is stated that the application of this provision would restrain the freedom guaranteed to workers to join together in a union and to advance collectively their cause. The second argument is aimed at those portions of § 86 which permit the Casino Control Commission to pass on the quality, nature and purposes of the plaintiffs' associations. It is said that the language of § 86 gives too much discretion to the Commission, is too broadly and vaguely worded to withstand constitutional scrutiny, and thereby inhibits the rights of plaintiffs and others to engage in associational activity protected by the First Amendment. It is further argued that § 86 is so vaguely worded that it fails to give notice of what sort of actions may be punishable, and for that reason its application would violate due process.

■ We may not abstain on these questions for two reasons. First, abstention has been held to be particularly inappropriate where the plaintiff has alleged that the statute sought to be enjoined inhibits the exercise of First Amendment freedoms. *Cameron v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). These rights, if actually inhibited, are too important to permit any delay and additional cost to be imposed by deferring their vindication to another forum. Secondly, there are cases where the challenge to the statute is so insubstantial that the court may conclude that none of the purposes of *Pullman* abstention would be served by forcing the litigants to settle their claims in state court. In cases where the challenge to the state statute is destined to fail, it is unnecessary to have the state courts set forth their construction of the statute so that the federal constitutional issues might be mooted or presented in a new light. *See International Longshoremen's Association v. Waterfront Commission*, 495 F.Supp. 1101, 1114 (S.D.N.Y.1980), *affirmed in part*, 642 F.2d 666 (2nd Cir.

1981). For the reasons explained below, this is such a case.

It has already been stated that the challenge to the statute is at this point a facial one, based on the assertion that §§ 93 and 86 are invalid in their application to labor unions under any circumstances. Were the court presented with a challenge to a specific application of these provisions, the question of whether to abstain might be differently decided. Additionally, our decision not to abstain does not prevent the state courts from construing the Casino Control Act in as narrow a fashion as they may see fit, *International Longshoremen's Association v. Waterfront Commission, supra*, 495 F.Supp. 1101, 1114, or from deciding that the Constitution of New Jersey, *e.g.*, N.J.Stat.Ann.Const. Art. 1, § 6 (liberty of speech) (West 1971); N.J.Stat.Ann.Const. Art. 1, § 19 (West 1971) (right to organize and bargain collectively), prevents the Act from being enforceable against labor unions and their members.

■ The First Amendment's protection of freedom of association extends to labor union activities, such as the right to solicit union membership, and to join for the purposes of redress in the grievances of union members. *United Mine Workers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Staub v. City of Baxley*, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945). It is obvious that money is required to enable the effective exercise of First Amendment rights, *e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and the effective functioning of any union. *Abood v. Detroit Board of Education*, 431 U.S. 209, 221, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977). The prohibition of collection of dues would be nearly as effective a ban on the union's First Amendment activities as would a more direct prohibition against such activities. *International Longshoremen's Association v. Waterfront Commission*, 495 F.Supp. 1101, 1132–33 (S.D.N.Y.1980), *af-*

firmed in part, 642 F.2d 666 (2nd Cir. 1981); *United Mine Workers of America, District 12, supra,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). The Casino Control Act's grant of power to prohibit the collection of union dues must be subject to the same kind of constitutional scrutiny as a direct ban on the union's activities.

This case does not involve a prior restraint on the exercise of First Amendment freedoms such as was forbidden in *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), and *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). The collection of dues which plaintiffs fear may soon be forbidden has continued unencumbered to this day, and will no doubt go on during the pendency of any hearing. It is only after certain findings of fact are made by the Commission that the restraint on dues collection may be imposed. This much has been provided for in § 93. More fundamental to our inquiry is the issue of whether the Casino Control Act grants to the Commission the kind of broad discretion—unbridled by any standards to guide enforcement—which has led to invalidation of state statutes which attempt to subject the exercise of First Amendment activities to licensing requirements. *E.g., Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). The question of whether there are sufficiently defined standards to guide the Commission in enforcing § 93 involves the questions of overbreadth and vagueness. If § 86 gives insufficient guides for the enforcement of § 93, then the Casino Control Act may not permissibly be applied to prevent the collection of union dues. Therefore, examination of § 86 to determine if it is overbroad or vague is in order.

### 1. *Overbreadth*

██ The overbreadth doctrine which plaintiffs seek to have applied on this motion is a rule which permits parties in cases involving challenges to government restrictions of First Amendment freedoms to argue that the regulation is invalid because of its effect on the First Amendment rights of others not presently before the court. *Village of Hoffman Estates v. Flipside, Inc.,* —— U.S. ——, ——, 102 S.Ct. 1186, 1197, 71 L.Ed.2d 362 (1982) (White, J., concurring); *Broadrick v. Oklahoma,* 413 U.S. 601, 612–15, 93 S.Ct. 2908, 2915–17, 37 L.Ed.2d 830 (1973). The effort to apply the doctrine is particularly appropriate here, because no sanctions have been applied to plaintiffs for any of their conduct—whether protected by the First Amendment or otherwise. It is only possible for this court to inquire into whether the statute "reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman, supra,* —— U.S. ——, 102 S.Ct. 1186, 1189–90.

██ The plaintiffs have argued that § 86 permits too broad an inquiry into the associational activities of registrants and applicants for licenses. We may assume, for the purposes of this argument, that the First Amendment guarantees to the individual citizen the right to associate for political and social purposes, so long as there is not some showing that the association is for some purpose which endangers the public welfare. *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). It has also been held that a governmental inquiry into all of the associations of government workers, without any explicit limitations on how these associations might be weighed in considering the qualifications of the workers, impermissibly inhibits those workers in the exercise of their associational freedoms. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

The Casino Control Act does not provide any warrant to the Commission to take the sort of blunderbuss approach condemned in *Shelton v. Tucker, supra.* Section 86 does not call for an inquiry into every political and social association of an applicant. The only sort of association which might lead to disqualification under the Casino Control Act is set forth in § 86 f, which allows

sanctions when an applicant has been identified as an "associate of a career offender or a career offender cartel in . . . a manner which creates a reasonable belief that the association is . . . inimical to the policy of this act and to gaming operations." N.J. Stat.Ann. § 5:12–86 f (West Supp.1981). The provision goes on to state that a career offender, roughly, is one who has made an occupation of violating the public policy of the state in a criminal manner for economic gain. *Id.*

Section 86 is aimed primarily at illegal activities for profit. The overbreadth doctrine does not apply to commercial transactions, *Central Hudson Gas & Electric Co. v. Public Service Commission*, 447 U.S. 557, 565, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); *Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973), primarily because it is believed that those who profit through the exercise of their First Amendment freedoms need not rely on others to assert their rights vicariously. To the extent that the associations burdened are for the purpose of violating criminal laws, there is no need to question that such associations may be outlawed altogether.

█ The likelihood that § 86 f will inhibit associational activities other than those just described is minimal. It is not aimed primarily at non-criminal, non-economic associations, and for this reason, we reject plaintiffs' overbreadth claim. The statute does not reach so far into the realm of protected activities as to call for its facial invalidation. *Broadrick v. Oklahoma, supra.*

### 2. Vagueness

█ The final ground asserted by plaintiffs on this motion for preliminary relief is that the statute is impermissibly vague. A statute is void for vagueness when its words fail to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden . . . ." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *see also United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). When a penal provision is not ". . . sufficiently explicit to inform those who are subject to it, what conduct on their part will render them liable to its penalties, . . ." *Connally v. General Construction Company*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), there is a denial of the due process required by the Fourteenth Amendment. *Lanzetta v. New Jersey, supra*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888. Explicit standards of conduct are also required in order to protect against arbitrary enforcement. *Papachristou, supra.*

The vagueness doctrine was recently expounded in *Village of Hoffman Estates v. Flipside, Inc., supra*, —— U.S. at —— ——, 102 S.Ct. at 1193. There the Court quoted from *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972):

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." (footnotes omitted). *Id.*

The Court continued:

These standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment. Thus, economic regulation is sub-

ject to a less strict vagueness test because its subject-matter is often more narrow, ... The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Village of Hoffman Estates, supra,* —— U.S. at ——– ——, 102 S.Ct. at 1193–94 (footnotes omitted).

These considerations must inform our inquiry into whether the standards enunciated by § 86 are too vague ever to be applied fairly to any citizen.[4] The first consideration is that the allegedly vague portions of § 86 are aimed primarily at economic activities. This is clear from our overbreadth analysis of § 86 f, which is similar to the challenged portions of § 86 e. Secondly, the penalties which the Act imposes are civil rather than criminal.

■■■ Before turning to the other considerations enumerated in *Village of Hoffman Estates, supra,* we note that §§ 86 e and 86 f provide that activities may provide grounds for sanctions only if they create a "reasonable belief" that the conduct in question would reflect poorly on the applicant's qualifications for licensure. *Id.* Our attention has been drawn to the Commission's opinion in the matter of the *Application of Resorts International Hotel, Inc. for*

a *Casino License,* Docket No. 79–CL–1 (undated) (Defendants' Exhibit 6), from which it is clear that the actions of an applicant are judged by the ethical and legal standards which were prevailing at the time and place of the actions in question. *Id.,* at 34, 43, 53, 84.[5] This interpretation of § 86 is consistent with "reasonable belief" requirement, inasmuch as it establishes an objective standard for judging an applicant's actions. With the case at bar, we may compare *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), where the Court declared that an ordinance could not constitutionally proscribe conduct "annoying to persons passing by." It was held that the "annoying" standard could not be fairly applied because, "Conduct that annoys some people does not annoy others." *Id.,* at 614, 91 S.Ct. at 1688. This subjective standard differs greatly from the objective standard which is preserved here.

The application of the objective standard serves many of the same purposes as would a scienter requirement, in that it includes an element of notice to the potential applicant. Conduct which a reasonable person does not expect to provide grounds for suspicion, and which does not violate contemporary legal and ethical standards, would not likely result in disqualification for that person. The objective standard also minimizes the opportunities for arbitrary enforcement, one of the most important problems with laws which have been found vague. Further, the provision requiring the Commission to prepare specific findings of fact and to state the reasons for denying any applications also reduces the danger that there will be arbitrary enforcement. N.J.Stat.Ann. § 5:12–94 c (West Supp. 1981).

The most crucial question raised in deciding whether a statute is impermissibly vague is whether it inhibits the exercise of

---

**4.** The Court stated in *Village of Hoffman Estates* that to succeed on a vagueness claim, "... the complainant must demonstrate that the law is impermissibly vague in *all* of its applications." *Id.,* —— U.S. at ——, 102 S.Ct. at 1191 (emphasis supplied).

**5.** In determining the meaning of the Casino Control Act, this court should consider the interpretation of the statute given by those charged with enforcing it. *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972).

First Amendment freedoms. It has already been indicated in our analysis of the overbreadth issue that the Casino Control Act is not aimed substantially at protected associations.

In view of all of these considerations, the court concludes that plaintiffs are not likely to succeed on the merits of their vagueness claim. Nor are they likely to succeed on the merits of their related overbreadth and First Amendment claims. The absence of any irreparable harm *pendente lite* has already been discussed in connection with the discussion of plaintiffs' preemption claims, as has the conclusion that the balance of equities and the public interest weigh against the issuance of a preliminary injunction.

## V. CONCLUSION

For the reasons set forth herein, an order denying plaintiffs' application for a preliminary injunction will be entered.

### APPENDIX

Selected portions of the Casino Control Act, as codified in N.J.Stat.Ann. (West Supp. 1981).

**5:12–86. Casino license—disqualification criteria**

The commission shall deny a casino license to any applicant who is disqualified on the basis of any of the following criteria:

a. Failure of the applicant to prove by clear and convincing evidence that the applicant is qualified in accordance with the provisions of this act;

b. Failure of the applicant to provide information, documentation and assurances required by the act or requested by the commission, or failure of the applicant to reveal any fact material to qualification, or the supplying of information which is untrue or misleading as to a material fact pertaining to the qualification criteria;

c. The conviction of the applicant, or of any person required to be qualified under this act as a condition of a casino license, of any offense in any jurisdiction which would be under New Jersey law at the time of application ~~a capital offense or a high misdemeanor or a misdemeanor under any of the following sections of the statutory law:~~

a violation of any of the following provisions of law:

(1) With respect to convictions obtained pursuant to the "New Jersey Code of Criminal Justice," P.L.1978, c. 95 (Title 2C of the New Jersey Statutes) as amended and supplemented:

all crimes of the first degree:

N.J.S. 2C:5–1 (attempt to commit an offense which is listed in this paragraph):

N.J.S. 2C:5–2 (conspiracy to commit an offense which is listed in this paragraph):

N.J.S. 2C:11–4b. (manslaughter);

N.J.S. 2C:12–1b. (aggravated assault which constitutes a crime of the second or third degree):

N.J.S. 2C:15–1 (robberies):

N.J.S. 2C:17–1a. and b. (crimes involving arson and related offenses):

N.J.S. 2C:17–2a. and b. (causing or risking widespread injury or damage):

N.J.S. 2C:18–2 (burglary which constitutes a crime of the second degree):

N.J.S. 2C:20–1 et seq. (theft and related offenses which constitute crimes of the second and third degrees):

N.J.S. 2C:20–7 (receiving stolen property):

N.J.S. 2C:21–1 et seq. (forgery and fraudulent practices which constitute crimes of the second and third degrees):

N.J.S. 2C:21–1a. (falsifying or tampering with records):

N.J.S. 2C:21–14 (receiving deposits in a failing financial institution):

N.J.S. 2C:27–1 et seq. (bribery and corrupt influence):

N.J.S. 2C:28–1 et seq. (perjury and other falsification in official matters which constitutes a crime of the third and fourth degrees):

N.J.S. 2C:30–2 and N.J.S. 2C:30–3 (misconduct in office and abuse in office which constitutes a crime of the second degree);

N.J.S. 2C:37–1 et seq. (gambling offenses which constitute crimes of the third and fourth degrees);

N.J.S. 2C:37–7 (possession of a gambling device);

(2) With respect to convictions obtained under Title 2A of the New Jersey Statutes:

N.J.S. 2A:85–5 (attempt to commit an offense which is in this paragraph);

N.J.S. 2A:89–1 et seq. (arson and other burnings);

N.J.S. 2A:90–1 et seq. (assault and battery);

N.J.S. 2A:91–1 et seq. (banks and financial corporations);

N.J.S. 2A:93–1 (bribery of judge or magistrate; acceptance of bribe);

N.J.S. 2A:93–2 (bribery of legislators; acceptance by legislators or other persons);

N.J.S. 2A:93–4 (soliciting or receiving award for official vote);

N.J.S. 2A:93–6 (giving or accepting bribes in connection with government work, service, etc.);

N.J.S. 2A:93–10 (giving or promising bribe to participants in sporting contest);

N.J.S. 2A:93–13 (giving or promising bribe to referee, umpire or other official in sporting contest);

N.J.S. 2A:94–1 (breaking and entering or entering);

N.J.S. 2A:94–2 (use of high explosives in breaking or entering);

N.J.S. 2A:98–1 (conspiracy to commit an offense which is enumerated in this paragraph);

N.J.S. 2A:99–1 (obstructing execution of process; assaulting officers);

N.J.S. 2A:102–1 et seq. (embezzlement, conversion and misappropriation);

N.J.S. 2A:103–1 et seq. (embracery);

N.J.S. 2A:105–1 et seq. (extortion, threats and unlawful takings);

N.J.S. 2A:108–9 (narcotic drugs; persuading others to use);

N.J.S. 2A:109–1 to N.J.S. 2A:109–3, N.J.S. 2A:109–6 to N.J.S. 2A:109–9 (forgery and counterfeiting);

N.J.S. 2A:111–1 to N.J.S. 2A:111–3, N.J.S. 2A:111–5 to N.J.S. 2A:111–15, N.J.S. 2A:111–18 to N.J.S. 2A:111–21.1, N.J.S. 2A:111–23 and N.J.S. 2A:111–24, N.J.S. 2A:111–28 to N.J.S. 2A:111–32, N.J.S. 2A:111–34 to N.J.S. 2A:111–35, N.J.S. 2A:111–37 to N.J.S. 2A:111–46 (frauds and cheats);

N.J.S. 2A:112–1 et seq. (gaming);

N.J.S. 2A:113–1 (murder);

N.J.S. 2A:113–5 (manslaughter);

N.J.S. 2A:114–2 (incestuous conduct between parent and child);

N.J.S. 2A:118–1 et seq. (kidnapping);

N.J.S. 2A:119–1 to N.J.S. 2A:119–5, P.L. 1965, c. 52 (C. 2A:119–5.1 et seq.) (larceny and other stealings);

N.J.S. 2A:119–8 (stealing narcotic drugs; breaking and entering with intent to steal);

P.L.1968, c. 349 (C. 2A:119A–1 et seq.) (loansharking);

N.J.S. 2A:121–1 et seq. (lotteries);

N.J.S. 2A:125–1 et seq. (mayhem);

N.J.S. 2A:131–1 to N.J.S. 2A:131–3 (perjury and subornation of perjury);

N.J.S. 2A:135–3 (public officers or employees unlawfully obtaining state, county, municipal or school district funds);

N.J.S. 2A:138–1 et seq. (rape and carnal abuse);

N.J.S. 2A:139–1 et seq. (receiving stolen property);

N.J.S. 2A:141–1 (robbery);

N.J.S. 2A:143–2 (sodomy with children under 10);

P.L.1957, c. 49 (C. 2A:148–22.1) (giving false information to law enforcement officer or agency);

(3) any high misdemeanor under section 19 of P.L.1970, c. 226 (C. 24:21–19) or

(4) any other offense which indicates that licensure of the applicant would be inimical to the policy of this act and to casino operations; provided, however, that the automatic disqualification provisions of

this subsection shall not apply with regard to any conviction which did not occur within the 10-year period immediately preceding application for licensure and which the applicant demonstrates by clear and convincing evidence does not justify automatic disqualification pursuant to this subsection and any conviction which has been the subject of a judicial order of expungement or sealing and provided, further however, that, any applicant or any person required to be qualified under this act as a condition of a casino license who is disqualified on the basis of paragraph (2) herein shall not be so disqualified if such applicant or person demonstrates to the commission by clear and convincing evidence that the act or acts which constitute the offense which forms the basis for such disqualification would not form the basis for a disqualification pursuant to paragraph (1) of this section;

d. Current prosecution or pending charges in any jurisdiction of the applicant or of any person who is required to be qualified under this act as a condition of a casino license, for any of the offenses enumerated in subsection c. of this section; provided, however, that at the request of the applicant or the person charged, the commission shall defer decision upon such application during the pendency of such charge;

e. The pursuit by the applicant or any person who is required to be qualified under this act as a condition of a casino license of economic gain in an occupational manner or context which is in violation of the criminal or civil public policies of this State, if such pursuit creates a reasonable belief that the participation of such person in casino operations would be inimical to the policies of this act or to legalized gaming in this State. For purposes of this section, occupational manner or context shall be defined as the systematic planning, administration, management, or execution of an activity for financial gain;

f. The identification of the applicant or any person who is required to be qualified under this act as a condition of a casino license as a career offender or a member of a career offender cartel or an associate of a career offender or career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of this act and to gaming operations. For purposes of this section, career offender shall be defined as any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of this State. A career offender cartel shall be defined as any group of persons who operate together as career offenders;

g. The commission by the applicant or any person who is required to be qualified under this act as a condition of a casino license of any act or acts which would constitute any offense under subsection c. of this section, even if such conduct has not or may not be prosecuted under the criminal laws of this State; and

h. Contumacious defiance by the applicant or any person who is required to be qualified under this act of any legislative investigatory body or other official investigatory body of this State any state or of the United States when such body is engaged in the investigation of crimes relating to gaming, official corruption, or organized crime activity.

\* \* \* \* \* \*

**5:12–93. Registration of labor organizations**

a. Each labor organization, union or affiliate seeking to represent employees licensed under this act and employed by a casino hotel or a casino licensee shall register with the commission annually, and shall disclose such information to the commission as the commission may require, including the names of all affiliated organizations, pension and welfare systems and all officers and agents of such organizations and systems; provided, however, that no labor organization, union, or affiliate shall be required to furnish such information to the extent such information is included in a report filed by any labor organization, union, or affiliate with the Secretary of Labor

pursuant to 29 U.S.C. §§ 431 et seq. or 1001 et seq. if a copy of such report, or of the portion thereof containing such information, is furnished to the commission pursuant to the aforesaid Federal provisions. The commission may in its discretion exempt any labor organization, union, or affiliate from the registration requirements of this subsection where the commission finds that such organization, union or affiliate is not the certified bargaining representative of any employee licensed under this act, is not involved actively, directly or substantially in the control or direction of the representation of any such employee, and is not seeking to do so.

b. No labor organization, union or affiliate registered or required to be registered pursuant to this section and representing or seeking to represent employees licensed under this act may receive any dues from any employee licensed under this act and employed by a casino licensee or its agent, or administer any pension or welfare funds, if any officer, agent, or principal employee of the labor organization, union or affiliate is disqualified in accordance with the criteria contained in section 86 of this act. The commission may for the purposes of this subsection waive any disqualification criterion consistent with the public policy of this act and upon a finding that the interests of justice so require.

c. Neither a labor organization, union or affiliate nor its officers and agents not otherwise individually licensed under this act and employed by a casino licensee may hold any financial interest whatsoever in the casino hotel or casino licensee whose employees they represent.

## 5:12–94. Approval and Denial of Registrations and Licenses Other Than Casino Licenses

a. Upon the filing of an application for any license or registration required by this act other than a casino license, and after submission of such supplemental information as the commission may require, the commission shall request the division to conduct such investigation into the qualification of the applicant, and the commission shall conduct such hearings concerning the qualification of the applicant in accordance with its regulations as may be necessary to determine qualification for such license or registration.

b. After such investigation, the commission may either deny the application or grant a license to or accept the registration of an applicant whom it determines to be qualified to hold such license or registration. Notwithstanding the above, the chairman may, where authorized, grant a casino employee license or a casino hotel employee license upon application therefor; if said application is denied, the appellant may appeal to the commission in the normal course.

c. The commission shall have the authority to deny any application pursuant to the provisions of this act. When an application is denied, the commission shall prepare and file its order denying such application with the general reasons therefor, and if requested by the applicant, shall further prepare and file a statement of the reasons for the denial, including the specific findings of facts.

d. When the commission grants an application, the commission may limit or place such restrictions thereupon as it may deem necessary in the public interest. Licenses shall be granted and registrations approved for a term of 1 year; provided, however, that casino employee licenses for positions directly related to gaming activity and for gaming school resident director, instructor, principal employee and sales representative licenses shall be granted for a term of 2 years; and provided further that casino employee licenses for positions not directly related to gaming activity, casino hotel employee licenses, and casino service industry licenses issued pursuant to subsection c. of section 92 of P.L.1977, c. 110 (C. 5:12–92c.) shall be granted for a term of 3 years.

e. After an application is submitted to the commission, final action of the commission shall be taken within 90 days after completion of all hearings and investigations and the receipt of all information required by the commission.

## ON MOTION FOR TEMPORARY IN-JUNCTION PENDING APPEAL

Hotel and Restaurant Employees and Bartenders International Union Local 54 (hereinafter "Local 54"), and its president, Frank Gerace, filed this action seeking a declaration that certain provisions of New Jersey's Casino Control Act, L.1977, c. 110, § 1 *et seq.*, as amended by L.1978, c. 7, § 1 *et seq.*, N.J.Stat.Ann. § 5:12–1 *et seq.* (West Supp.1981), may not constitutionally be enforced against them. Plaintiffs also seek relief in the form of damages and an injunction. Plaintiffs have invoked 28 U.S. C.A. §§ 1331, 1337, 1343 (West Supp.1981) as sources of this court's jurisdiction. Plaintiffs sought to have this court enjoin hearings scheduled by the defendant Casino Control Commission *pendente lite*, and the court denied plaintiffs' motion for preliminary injunction on March 22, 1982. (*See* Opinion and Order, March 22, 1982).

The matter is currently before the court on the motion of plaintiffs for a temporary injunction pending appeal, which the court has authority to grant under Rule 62(c), Fed.R.Civ.P. That rule reads in part: "When an appeal is taken from an interlocutory or final judgment granting, dissolving or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms ... as it considers proper for the security of the rights of the adverse party." *Id.* Plaintiffs have filed a notice of appeal from the decision of March 22, 1982, purportedly under the provisions of 28 U.S.C.A. § 1292(a) (West 1966). The court has been informed that the defendant Casino Control Commission has scheduled hearings pursuant to § 93 of the Casino Control Act. N.J.Stat.Ann. 5:12–93 (West Supp.1981), to begin on April 26, 1982.

On a motion for an injunction authorized by Rule 62, Fed.R.Civ.P., it is well established that the court must evaluate the extent to which the moving party has made a showing as to the following four factors:

(1) the likelihood of the moving party's success on the merits of its appeal;

(2) the likelihood of irreparable injury to the moving party if the injunction is denied;

(3) the extent to which the opposing parties will be harmed if the injunction sought is issued; and

(4) the likelihood that there will be no substantial harm to the public interest if the injunction sought is issued.

*Long v. Robinson,* 432 F.2d 977 (4th Cir. 1970); *Philadelphia Council of Neighborhood Organizations v. Adams,* 451 F.Supp. 114 (E.D.Pa.1978); *Evans v. Buchanan,* 435 F.Supp. 832 (D.Del.1977); *Resident Advisory Board v. Rizzo,* 429 F.Supp. 222 (E.D.Pa. 1977). Of course, no single factor is controlling, and the court must balance the strength of the plaintiffs' showing on each of these four factors as part of its exercise of discretion in considering the motion. *Phila. Council of Neighborhood Organizations, supra,* 451 F.Supp., at 116, *citing, Evans v. Buchanan,* 424 F.Supp. 875, 879 (D.Del.1976). The court will discuss each of these four factors below.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS OF THE APPEAL

Plaintiffs have not filed a motion for reconsideration, nor have they treated the instant motion as one. It has been recognized that there is an almost insurmountable burden in requiring a party to satisfy a court that its decision on a matter which it has considered extensively was erroneous. Yet, this is what is required if a party is to show the court that it is likely to succeed on appeal. *See Evans v. Buchanan,* 435 F.Supp. 832, 835, 843 (D.Del.1977). The court does not take plaintiffs' efforts to show this court that it was in error as an affront. Nevertheless, the court feels that the arguments are best left unanswered when the other factors which the court is required to consider can determine the outcome of the motion. Plaintiffs stated at oral argument that the posture of the instant case is different from that of a case on which the court is said to have placed "primary reliance." The court feels that the opinion of March 22 should speak for

itself, and that it should not indulge in discussions of which precedents were more persuasive than others if such discussion is not necessary. For this reason, the court will turn to the other factors which plaintiffs are required to show.

## II. IRREPARABLE HARM

The court is not satisfied that plaintiffs will suffer irreparable harm during the pendency of the appeal if the Casino Control Commission's hearings are not enjoined. Plaintiff argues that the publicity which will likely result from the hearings which are scheduled to begin on April 26 will have an impact on the elections scheduled for June, 1982, in which the members of plaintiff Local 54 will choose their leaders. Reference by plaintiffs is made to page 332 of the opinion of March 22, where it was stated:

We may not find that there is irreparable harm simply because the hearings might lead to bad publicity about the union and its leaders, as they argue. In the case of *Cab Operating Corp. v. City of New York*, 243 F.Supp. 550 (S.D.N.Y. 1965), it was held that irreparable harm could be found where a representation election required by a municipal ordinance would interfere with a later federally sanctioned representation election. It was said in that case that the publication of the results of the first election would likely affect the outcome of the second election. It has not been shown that an election involving Local 54 is impending in the immediate future, and we do not decide whether *Cab Operating Corp., supra*, would be applicable here if such an election were so scheduled.

In *Cab Operating Corp., supra*, the court enjoined the release of the results of a municipally sanctioned election for union representation where a federally sanctioned election was likely to follow closely on its heels under different conditions and rules. It was held that these circumstances brought the case within those which prohibited "... activities of officers or bodies purporting to act under the sanction of state or local law to coerce parties to a controversy or to force its resolution through the pressure of molded public opinion in derogation of federally granted rights." *Id.*, at 556 (citations omitted). It is clear that the Casino Control Commission's hearings do not rise to the level of direct interference with federally sanctioned activities which was present in the *Cab Operating Corp.* case. Nor do the state's activities sink to the nadir of illegitimacy which the court faced in that case. Publicity about union activities is a product of a free and vigorous press, and so long as it is not engineered by state action for the purpose of undermining federally sanctioned activities, the court is not free to interfere.

Plaintiffs also assert that irreparable harm will befall them if an injunction is not entered because certain of the issues which they raised in their motion for a preliminary injunction may be mooted during the pendency of their appeal. In their brief, at page 9, it is stated:

This entire case and the issues on Appeal revolve around proposed state activity which is now threatened to occur in its entirety pending appeal. There can be little doubt that the Commission hearings will be held in full before the merits of the Plaintiffs' Appeal are finally determined by the Third Circuit. Given that the focus of the Plaintiffs' Appeal is to obtain an injunction of the Commission hearings, if the hearings are allowed to run their course pending Appeal, the practical import of the relief sought by the Plaintiffs will be mooted. If the Plaintiffs are victorious on Appeal, such a victory will be academic. Accordingly, for this reason it is further appropriate to grant interim relief. *J. Weingarten, Inc. v. Potter*, 233 F.Supp. 833 (S.D.Tex.1964).

Plaintiffs have informed this court that they have moved or will soon move for an expedited determination of their appeal. The question of whether the appeal may be determined before the Casino Control Commission takes any action which might render moot some of the issues raised by plain-

tiffs is solely within the control of the appellate panel. Any determination of this question by this court would be based on nothing more than mere speculation.

### III. HARM TO THE DEFENDANTS AND TO THE PUBLIC INTEREST

This court is required to consider the extent to which an injunction might harm the interests of the defendants and of the public. Consideration of these factors on the motion for a preliminary injunction led this court to the conclusion that the state's regulatory mechanism should be allowed "to run its course, with the defendants left to their effort to apply the statute in a constitutionally permissible manner as they see fit." Opinion of March 22, at page 332. The court is reaching the same conclusion on the instant motion.

### IV. CONCLUSION

For the reasons stated above, the plaintiffs' motion for an injunction pending appeal will be denied. The court will enter an appropriate order.